UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :

UNITED STATES OF AMERICA            **SENTENCING**
                                  :            **SUBMISSION**

      - v. -
                                  :

CHIGBO PETER UMEH,                S9 09 Cr. 524 (JSR)
                                  :

          Defendant.
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - -- - - - - - - - - - - - x


# SENTENCING SUBMISSION OF
# THE UNITED STATES OF AMERICA


PREET BHARARA
*United States Attorney for the*
*Southern District of New York*
*Attorney for the United States*
*of America*

RANDALL W. JACKSON
CHRISTOPHER L. LAVIGNE
Assistant United States Attorneys,
Of Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                           :
UNITED STATES OF AMERICA                   :   **SENTENCING**
                                           :   **SUBMISSION**
       - v. -                              :
                                           :
CHIGBO PETER UMEH,                         :   S9 09 Cr. 524 (JSR)
                                           :
              Defendant.                   :
                                           :
- - - - - - - - - - - - - - - - -- - - - - - - - - - - - - - - x

      The Government respectfully submits this memorandum in advance of the sentencing of defendant Chigbo Peter Umeh, scheduled for July 28, 2011. On June 21, 2011, the United States Probation Department released a Presentence Investigation Report (the "PSR") for Umeh. After noting objections, the Probation Department released a final PSR with an addendum on July 20, 2011. With regard to the appropriate calculation of his offense level, Umeh challenges the PSR's findings regarding the relevant quantity of narcotics and Umeh's aggravating role as a leader of the conspiracy. For the reasons described in detail below, the Court should reject Umeh's objections and impose a sentence within the Guidelines range calculated in the PSR.

## BACKGROUND

      In the spring of 2009, defendant Chigbo Peter Umeh initiated a series of meetings with government officials in the Republic of Liberia. (PSR ¶¶ 12-14; GX 301).[1] At these meetings, Umeh, accompanied by several of his Colombian business partners, proposed that these officials agree to assist a drug trafficking organization with the movement and storage of several tons of cocaine. (PSR ¶ 14-15; GX 301, 300T6). In exchange, the narcotics traffickers agreed to pay the officials in excess of one million dollars cash and to release to the government officials a large quantity of cocaine, which would subsequently be distributed in the United States. (PSR ¶¶ 14-15, 24-25). The central target of Umeh's attempted bribe was Mr. Fomba Sirleaf, the Director of the Liberian National Security Agency ("NSA"), who was also the son of the President of Liberia, Madame Ellen Johnson Sirleaf. (PSR ¶¶ 22-23; Tr. 509)

      Umeh, however, was unaware that from the moment of his initial contact with the Liberian government officials, these officials began coordinating with the DEA in an operation to expose the membership and objectives of the drug trafficking organization. (PSR ¶ 23; Tr. 148-50). In connection with that investigation, the DEA had a confidential source ("CS-1"),

---

[1] "PSR" refers to the final July 20, 2011 Presentence Investigation Report; "Tr." refers to the transcript of trial which began on April 4, 2011; "GX" refers to the Government's exhibits admitted at the trial.

using the name "Nabil Hage," introduce himself to Umeh as Sirleaf's business manager. (PSR ¶¶ 23-25; Tr. 149-52, 509-11). CS-1 then recorded each meeting between Umeh, his Colombian counterparts, and the Liberian government officials. (Tr. 157-58). At subsequent meetings and conversations over the phone, Umeh negotiated the details of the payments to be made to the government officials and the organization's plans for the importation of the cocaine by air and sea shipment. (PSR ¶¶ 24-28; GX 301).

In February of 2010, Umeh asked "Nabil Hage" about pilots and aircraft available to assist with the movement of 4,000 kilograms of the cocaine. (PSR ¶ 29). CS-1 then introduced Umeh to pilot Konstantin Yaroshenko, who had been in contact with another DEA confidential source regarding the movement of illicit goods. (PSR ¶¶ 30-33). In May of 2010, Yaroshenko flew from Russia to Liberia to negotiate the details of his anticipated work with Umeh. (PSR ¶ 32). After a series of negotiations, Umeh agreed to pay Yaroshenko $4.5 million dollars to transfer the cocaine from Venezuela to Liberia as well as additional funds to subsequently transfer a portion of the cocaine to Ghana, where it would be loaded on commercial flights to the United States. (PSR ¶ 33, 35).

In May of 2010, Umeh also introduced two other individuals to the Liberian government official and CS-1, Nathaniel French and Kudufia Mawuko. (PSR ¶¶ 34, 36). Umeh explained that these individuals would assist Umeh in the offloading of the cocaine from sea shipments and in the transportation of the cocaine within Africa. (PSR ¶¶ 34, 36). In late May and early June of 2010, Liberian officials arrested Umeh, Yaroshenko, French and Mawuko and turned them over to the custody of the DEA, who transported all four to the United States. (PSR ¶ 46).

## PROCEDURAL HISTORY

The Government filed Superseding Indictment S9 08 CR 789 (RJS), which was returned by a grand jury in the Southern District of New York, on July 1, 201. (PSR ¶ 1). Count One, the sole count of the Indictment, charged Umeh, Yaroshenko, French, Mawuko ("the defendants") and others with conspiring to manufacture and distribute 5 kilograms and more of cocaine, with knowledge that some of the cocaine would later be imported into the United States, in violation of 21 U.S.C. §§ 963, 959(a), and 960. (PSR ¶ 2)

On April 4, 2011, trial commenced against the defendants. (Tr. 3). On April 28, 2011, the jury found Umeh and Yaroshenko guilty and acquitted the other two defendants.

## GUIDELINES CALCULATION

U.S.S.G § 2D1.1 (a)(3) is the guideline applicable to the instant offense. The conspiracy involved the distribution of over 150 kilograms of cocaine. Therefore, pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1), the base offense level for Umeh is 38. (PSR ¶ 53).

Umeh's offense level is increased by four levels, pursuant to U.S.S.G. §3B1.1(a), because of his role in the offense. (PSR ¶ 56). Umeh was a leader of the conspiracy and the conspiracy involved more than five participants. (PSR ¶ 56). The applicable total offense level for Umeh is therefore level 42. (PSR ¶ 62).

3

The defendant's Criminal History Category is II. (PSR ¶ 73). The applicable Guidelines range is therefore 360 months' to life imprisonment. (PSR ¶ 108). A mandatory minimum term of 20 years' imprisonment applies. (PSR ¶ 107).

**APPLICABLE LAW**

The United States Sentencing Guidelines (the "Guidelines") still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court recently stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1)); the four legitimate purposes of sentencing (§ 3553(a)(2)); "the kinds of sentences available" (§ 3553(a)(3)); the Guidelines range itself (§ 3553(a)(4)); any relevant policy statement by the Sentencing Commission (§ 3553(a)(5)); "the need to avoid unwarranted sentence disparities among defendants" (§ 3553(a)(6)); and "the need to provide restitution to any victims" (§ 3553(a)(7)). *Gall* v. *United States*, 128 S. Ct. at 597.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall* v. *United States*, 128 S. Ct. at 597 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on extensive empirical

evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 128 S. Ct. at 594. *See also Rita* v. *United States*, 127 S. Ct. at 2464. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall* v. *United States*, 126 S. Ct. at 597.

## DISCUSSION

**A.     Quantity Determination**

   **1.     Applicable Law**

Pursuant to U.S.S.G. § 1B1.3, a defendant is responsible at sentencing for "all acts and omissions committed, aided, abetted . . . or willfully caused by the defendant," and "in the case of jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Under U.S.S.G. § 2D1.1(a)(5) and (c)(1), the base offense level is 38 where more that 150 kilograms of cocaine are involved in the offense.

   **2.     The Relevant Quantity of Cocaine is More than 150 Kilograms**

It is undisputed that the conspiracy involved the distribution of thousands of kilograms of cocaine throughout the world. Umeh argues, however, that only the cocaine specifically designated for the United States should be considered in calculating his offense level, and that this amount was never determined. First, this argument is legally incorrect, as Section 1B1.3 suggests that all amounts of cocaine involved in the conspiracy should be considered relevant in calculating the appropriate offense level. *Cf. United States* v. *Young*, 609 F.3d 348, 357-59 (4th Cir. 2010) (noting that "'[r]elevant conduct' under the Guidelines, of course, often includes a broader range of conduct than the conduct underlying the offense of conviction" and affirming district court's inclusion of acquitted conduct in calculating appropriate amount of cocaine to be considered in calculating offense level). It would be a perversion of the intent of the narcotics sections of the Guidelines to disregard the thousands of kilograms of cocaine involved in the conduct underlying the Indictment. This is particularly true given that the ultimate destination of much of the cocaine involved in the conspiracy is unknown.

Regardless, the amount of cocaine specifically designated for importation into the United States easily exceeded 150 kilograms. From the very beginning of the recorded conversations, quantities exceeding 150 kilograms were discussed by Umeh and other conspirators. At the October 10, 2009 meeting, the following exchange occurred between CS-1 and Umeh:

> NABIL:     I can take ... maybe ... maybe ... maybe a couple of hundred kilos, you know? Just for the States but nothing else. I cannot, I don't want to do anything else. We want ... you know what? You don't want us to do anything else because the cleaner we are ...

5

>            UMEH:           The better.

>            NABIL:          ... the better for us, the better for you

(GX 301, 300T-5). Indeed, at the May 13, 2010 meeting, Umeh, Yaroshenko and CS-1 explicitly discussed the plan for Yaroshenko to move 700 kilograms of the cocaine to a location in Ghana, at least 200 kilograms of which was to be directly imported into the United States. (GX 301, 300T-29R2) ("Of 700 kilos . . . . Because he has 500 and I need 200 that I promised thanks to you one year ago . . . . It's going to be with diplomatic baggage."). At other meetings, CS-1 discussed with members of the conspiracy his intentions to continue importing cocaine into the United States from future shipments. For example, at a March 5, 2010 meeting between CS-1 and Yaroshenko, CS-1 stated "But I want for my clients in America I want every month about 200, 300 kilos." (GX 301; 300T-16). Moreover, the thrust of all of CS-1's 2010 conversations with Umeh was that a relationship would continue with Umeh supplying cocaine for delivery to CS-1's customers in America. It is therefore clear that, even disregarding the massive amounts of cocaine for which a specific final market was not designated, the amount of cocaine specifically intended for the United States exceeded 150 kilograms. The PSR's calculation that the appropriate base offense level is 38 is therefore correct. (PSR ¶ 53; U.S.S.G. § 2D1.1(c)(1)).

**B.      Increase in Offense Level for Aggravating Role**

    **1.      Applicable Law**

In determining whether a defendant was an organizer or leader in the offense, the Court must examine "the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy." *United States* v. *Tian*, 339 F.3d 143, 157 (2d Cir. 2003) (quoting United *States* v. *Beaulieau,* 959 F.2d 375, 379-80 (2d Cir. 1992)). Additionally, "one conspirator's leadership role is not dispositive on the question of whether another was also a leader." *Id.* (quoting *United States* v*. Duncan,* 42 F.3d 97, 106 n.6 (2d Cir. 1994) (citing U.S.S.G. § 3B1.1, Application Note 4)); *see United States* v. *Garcia,* 936 F.2d 648, 656 (2d Cir. 1991) ("[E]ven if [the defendant's co-defendant] were an organizer, the district court would not be precluded from finding [the defendant] to have been an organizer as well."). While the Guidelines require that the criminal activity involve more than 5 participants, the defendant need only be an organizer or leader of one or more of those participants for the section 3B1.1(a) increase to be appropriate. *See United States* v. *Zichettello,* 208 F.3d 72, 107 (2d Cir. 2000) (noting that defendants "are subject to [section 3B1.1(a)'s] enhancement even if they each managed only one other participant, not five.") (citing U.S.S.G. § 3B1.1, Application Note 2). Finally, in determining whether a defendant was a leader or organizer of the conspiracy, or in adjudicating any other contested fact at sentencing, the Court must utilize the preponderance of the evidence standard. *United States* v. *Salazar*, 489 F.3d 555, 558 (2d Cir. 2007).

## 2. Umeh was a leader of the conspiracy

The undisputed facts in the PSR as well as the evidence introduced at trial prove that Umeh was an organizer and leader of a drug conspiracy involving well more than five other individuals. Pursuant to U.S.S.G. § 3B1.1(a), the defendant's offense level must therefore be increased by 4 levels. First, the evidence in trial established that the conspiracy involved numerous participants named and unnamed, including individuals involved in the packaging of cocaine in Colombia, the crew of Yaroshenko's airplanes and other aircraft, the crew of boats intended for Liberia, individuals who would assist with the movement of the cocaine from Liberia to Ghana, and others. At a minimum, the conspiracy involved Umeh, Yaroshenko, Mawuko, French, and Colombians Jorge Ivan Salazar-Castano and Marcel Acevedo Sarmiento. (PSR ¶¶ 11-46 ). There is no reasonable question as to whether the requisite number of individuals were involved under Section 3B1.1(a).

Second, Umeh's actions and statements prove overwhelmingly that he was the driving force behind the conspiracy constituting a leader and organizer as those terms are understood by the Guidelines. At the May 26, 2010 meeting, Umeh revealed that the exploitation of Liberia as a global transshipment point for cocaine trafficking had been his plan for many years, and that he had engaged in extraordinary activity to further that plan. (GX 301, 300T-52R at 1) ("I want to straighten out something. Before I come here I am not hungry. I came here because I, I have a vision and I work torwards it. I been working on this thing right now I was here in the time of Charles Taylor."). Umeh went on to explain how, even during the administration of former Liberian dictator Charles Taylor, he was attempting to orchestrate a deal by which cocaine would be given safe passage in exchange for weapons. The tenacity with which Umeh pursued this plan over a period of years underscores the significance of his role within the international conspiracy.

At other meetings, Umeh demonstrated that he was the key organizer of the conspiracy through a number of telling statements and actions. At the May 17, 2009 meeting, the initial recorded meeting between the conspirators and the Liberian government officials, Umeh, accompanied by Salazar Castano, took the lead in explaining how the officials would be paid if they agreed to participate in the corrupt plan. (GX 301, 300T-36 at 40) ("when the thing lands here, you guys take control of the things. I can fly from Lagos with one million dollars and give it to you"). Later in this initial meeting, Umeh led the extended negotiation over the portion of the payment that would be delivered in cash and the portion that would be delivered in cocaine. (GX 301, 300T-36 at 48) ("and I'm talking about now, one million dollars, five hundred up front and another five hundred in product"). Umeh also emphasized that he wanted all communication to pass through him. (GX 300T-36 at 73) ("Communication. Any communication will have to be through me."). Later, it was Umeh who orchestrated the delivery of the $100,000 "down payment" of the bribe to Tony Souh, Deputy Directory of the NSA. (Tr. 909) (" When [Umeh] left that October meeting and went back to Colombia one day he called me to say that he was sending the one hundred thousand dollars through somebody in Nigeria's sister but, unfortunately, for the sister the money of that amount, cash in that amount could not leave Nigeria for any reason so it would be good that we go to Nigeria to receive the money. And I told him yes, we can do it").

In the late stages of the conspiracy, Umeh introduced French and Mawuko to CS-1, and indicated that these men were working at his direction to assist in the movement of the cocaine. *See* GX 300T-29 at 3-6 ("he is the person that is the expert that I told you is coming from Ghana"). During the discussion between CS-1, Souh, Umeh, French and Mawuko on May 14, 2010, Umeh explained that all of the financial matters, including French's and Mawuko's, would be controlled by Umeh. (GX 300T-32r at 6) (Umeh: "No, I pay everything . . . . Every account is on my account."). Umeh also was the person who negotiated to pay Yaroshenko and ultimately agreed on the amounts and system by which he would be paid. (GX 300T-29R at 12-17) ("The deposit we are discussing that part . . . . It's not the whole amount we are talking about. I don't have a problem with the four and a half [million]").

During his post-arrest statement on his extradition flight, Umeh revealed that he had flown to Colombia and directed a number of delicate conversations regarding the progress of the Liberia operation with the conspiracy's Colombian "investors" in the cocaine to be shipped to Africa. (Tr. 1106-09) ("Mr. Umeh told me that he told these individuals that he had secured security and safety in Liberia, that he was personal friends with the son of the president, Mr. Sirleaf, and that he had made an agreement with the son of the president and he referred to Nabil Hage as Fomba's secretary or the director's secretary, and that those individuals, specifically Mr. Sirleaf, had given him the green light, I think were the terms he used, to send cocaine into Liberia."). Agent Rapaszky's testimony regarding Umeh's post arrest statement also made clear that French and Mawuko only returned to Liberia, where they were ultimately arrested, after Umeh placed a call over a satellite phone directing them to return to Liberia to assist him with moving the cocaine. (Tr. 1201-04).

As all of this evidence makes clear, Umeh was the central figure in the conspiracy charged in the Indictment, a conspiracy to use Liberia as a global transhipment point for cocaine, including cocaine to be imported into the United States. In travelling across the globe to connect suppliers and investors, orchestrating the meetings with the Liberian government officials, arranging various payments and bribes, and recruiting French and Mawuko into the conspiracy, Umeh went far beyond the activity that courts have determined is sufficient for the imposition of a four-point enhancement under Section 3B1.1. *See, e.g., United States* v. *Gaskin*, 364 F.3d 438, 466-67 (2d Cir. 2004) (affirming district court's imposition of four point leadership enhancement where defendant was one of the organizers of domestic narcotics conspiracy consisting of eight participants and involving several hundred pounds of marijuana); *United States* v. *Chavez*, 549 F.3d 119, 136 (2d Cir. 2008) (affirming imposition of leader/organizer enhancement in domestic cocaine conspiracy with multiple leaders, involving several hundred kilograms of cocaine, on the basis of defendant's instructions on dilution of cocaine to one other participant, ability to fire one participant, and actions directing a participant to hide from the authorities). Not only is the scale of the conspiracy here much greater than in *Gaskin* or *Chavez*, but also Umeh's role is more complex and more wide ranging. In sum, the evidence introduced at trial overwhelmingly indicates that the imposition of a four point enhancement is appropriate. Pursuant to § 3B1.1, a four-level enhance of the defendant's offense level for leadership is appropriate.

## C. Section 3553(a) Factors

Here, the factors described in 18 U.S.C. § 3553(a) militate in favor of a Guidelines sentence for Umeh. In particular, the need for general and specific deterrence, the need for the sentence to reflect the seriousness of the offense, and the need to promote respect for the law are implicated in this case. Umeh is the rare defendant who orchestrated criminal activity with the literal power to destabilize nations. The heart of Umeh's trafficking scheme was a cynical attempt to corrupt government officials in a West African nation still attempting to rebuild a solid legal foundation after years of corruption and civil war. For this reason alone, the goals of the sentencing statute would support a Guidelines sentence. But here there are more reasons, because the quantities of cocaine and money with which Umeh and his conspirators dealt are staggering. At each stage of the conspiracy, the contemplated shipments to be received in Africa were thousands of kilograms of cocaine, to be distributed all over the earth. The bribes and payments Umeh negotiated were for millions of dollars. Umeh carried out these activities with reckless disregard to the individuals and communities that would be harmed by these drugs, and with utter indifference to the amount of power and funding his activity was funneling to various dangerous groups in the Americas and elsewhere. Indeed, Umeh noted in recorded conversations that one of the sources of the conspiracy's cocaine was the FARC, a Colombian guerilla group designated as a foreign terrorist organization by the U.S. State Department. As described above, Umeh also described how in the past he had attempted to broker the exchange of weapons for cocaine with Charles Taylor.

Perhaps most significant, in terms of the Section 3553(a) factors, Umeh is a recidivist who was previously convicted of extremely serious drug trafficking conduct in the United States. (PSR ¶¶ 64-72). After receiving a relatively lenient sentence for that activity, Umeh not only returned to drug trafficking, but actually expanded the scope of his activity. Indeed, beyond the massive cocaine operation, Umeh sought to expand his business to include the production of other narcotics at laboratories in Nigeria, including ecstacy, which Umeh contemplated distributed in Japan and elsewhere. (GX 300T-37 at 16-18). The goal of general deterrence requires that an individual in Umeh's shoes must receive a sentence commensurate with his activities. Moreover, the goal of promoting respect for the law requires a serious sentence in light of Umeh's recidivism. In many respects, Umeh is an extraordinarily skilled businessman, fluent in many languages, talented at negotiation across borders and cultures. Unfortunately, time and again, Umeh's greed and disregard for the public have led him to use these talents for the worst criminal purposes on literally every habitable continent. In sum, the Section 3553(a) factors weigh heavily in favor of a Guidelines sentence.

## CONCLUSION

For the foregoing reasons, the Government submits that sentences with the Guidelines ranges calculated in the defendants' respective PSRs would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing.

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By:          /s/         .
Randall W. Jackson
Christopher L. LaVigne
Assistant United States Attorneys
212-637-1029